**Otis PETERKIN,**

v.

**Martin HORN, et.al.**

**No. CIV. A. 95–CV–3989.**

United States District Court, E.D. Pennsylvania.

Nov. 6, 2001.

344

348

Billy H. Nolas, Kathryn R. Swedlow, Jerome H. Nickerson, Center of Legal

Educ., Advocacy & Defense Assistance, Philadelphia, PA, Stephen A. Whinston, Kenneth L. Fox, Michael L. Block, Berger & Montague, P.C., Philadelphia, PA, for plaintiff.

Donna G. Zucker, Philadelphia Dist. Attorney's Office, Philadelphia, PA, for defendants.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

This case is once again before this Court for consideration and disposition of Otis Peterkin's Petition for Writ of Habeas Corpus. For the reasons set forth below, the petition shall be granted.

### History of the Case

The instant petition arises out of a series of events which began on November 29, 1981 with the robbery of the Sunoco Service Station located at Broad and Catherine Streets in South Philadelphia and the murder of two of its employees. On December 2, 1981, the petitioner, Otis Peterkin, turned himself into the police after learning that a warrant had been issued for his arrest for the crimes. Petitioner was subsequently tried and convicted in September, 1982 of two counts of first degree murder for the shooting deaths of station manager John Smith and attendant Ronald Presbery, as well as one count each of robbery and possession of an instrument of crime. Petitioner's post-trial motions were denied and he was sentenced to death on the murder convictions, ten to twenty years' imprisonment on the robbery conviction, and two and one-half to five years on the conviction for possession of an instrument of crime.

Thereafter, Mr. Peterkin appealed his convictions and sentences to the Pennsylvania Supreme Court, making the following arguments on direct appeal:

1. That the Pennsylvania Death Penalty Statute is unconstitutional because it creates a conclusive presumption favoring death.

2. That he received ineffective assistance from his trial counsel in that counsel failed to investigate, research and apply the law, failed to interview witnesses, failed to object to the exclusion of those potential jurors who expressed opposition to the death penalty and to the death qualification of the jury, failed to raise constitutional challenges to the death penalty and failed to present evidence of mitigating circumstances and factors.

3. That the trial court erred in allowing the admission of irrelevant and hearsay testimony from, *inter alia*, Stanley Trader, Maurice Rogers, Diana Dunning and Clarence Sears and in denying petitioner standing to challenge the search of Sherry Diggins' apartment.

4. That trial counsel was further ineffective in: introducing himself to the jury as petitioner's "court-appointed" counsel; delivering a closing argument to the jury that was not based on the evidence presented; failing to prepare for sentencing and failing to present mitigation evidence at the penalty stage of the trial.

5. That a proportionality review reflects that the sentence of death was inappropriate and disproportionate in his case.

With the exception of finding that the testimony of Diana Dunning was irrelevant and that the hearsay statements made by Ronald Presbery to Stanley Trader and Clarence Sears were improperly admitted but were nonetheless harmless error, the Pennsylvania Supreme Court rejected petitioner's assignments of error and upheld his convictions and sentences. *See: Commonwealth v. Peterkin,* 511 Pa. 299, 513

A.2d 373 (1986). Mr. Peterkin appealed to the U.S. Supreme Court, which denied certiorari in 1987. *Peterkin v. Pennsylvania,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987).

Petitioner then sought relief *pro se* under the Pennsylvania Post Conviction Relief Act, 42 Pa.C.S. § 9541, *et. seq.* Counsel was appointed for him, but after reviewing the issues which Mr. Peterkin sought to raise, concluded that they either lacked merit or had been litigated earlier. Appointed counsel therefore filed a "no-merit" letter and requested permission to withdraw his appearance. The trial court granted counsel leave to withdraw and denied the PCRA petition without a hearing. Mr. Peterkin then appealed *pro se* to the Pennsylvania Superior Court which transferred the appeal to the Pennsylvania Supreme Court in accord with 42 Pa.C.S. § 9546(d). The Supreme Court remanded the case to the trial court to determine whether Mr. Peterkin was eligible for appointed counsel. Another attorney was subsequently appointed to represent the petitioner and the Pennsylvania Supreme Court then considered whether his convictions and sentences should be set aside on any of the following grounds:

1. He was denied his constitutional right to effective assistance of counsel where trial counsel failed to present character witnesses on his behalf at trial and where post-trial counsel failed to properly raise and argue this issue on direct appeal and in the court below on his PCRA petition.

2. He was denied his constitutional right to a fair trial and to due process of law where the prosecutor engaged in gross misconduct in his closing argument at trial and that both trial and post-trial counsel were ineffective in failing to raise and preserve this issue for appeal purposes.

3. The court failed to advise the jury that mitigating circumstances need not be found unanimously to be weighed and considered by individual jurors and prior counsel were ineffective in failing to raise and previously litigate this issue.

4. No sentence of death was imposed by the jury on either bill of information upon which he was found guilty of murder in the first degree, as both murder bills were submitted jointly to the jury for a single consideration and imposition of penalty.

5. Trial counsel failed to present available evidence in mitigation and an inadequate closing argument at sentencing thereby depriving him of his constitutional right to effective representation and post-trial counsel were ineffective in failing to properly raise this issue on direct appeal and to the court below on his PCRA petition.

6. He was denied his constitutional right to a fair trial and to due process of law as a result of prosecutorial misconduct in the sentencing argument and trial and post-trial counsel were ineffective in failing to object and preserve this error on direct appeal or in the court below on PCRA petition.

The Supreme Court found that the prosecutor may have committed error in requesting the jury to be as cold and ruthless as Petitioner had been when he murdered the victims and in telling the jury that the "best witnesses," i.e., the victims, "are not here," but if they were, he was "sure" that "they would tell you that it was not my choice to go this way, it was not my choice to go in that kind of pain." Nevertheless, the Supreme Court found that petitioner had failed to demonstrate that these remarks prejudiced the jury or that if they did, this error was also harm-

less given the overwhelming evidence of Petitioner's guilt. Accordingly, the trial court's denial of Petitioner's PCRA petition was affirmed.

By way of the petition for writ of habeas corpus which is now before this Court, Mr. Peterkin continues to seek to have his convictions and sentences overturned. In addition to reiterating the claims which he raised on direct appeal and in his initial PCRA petition, however, Mr. Peterkin now also asserts the following grounds [1] for the relief sought:

1. That the Commonwealth improperly withheld exculpatory evidence and presented inaccurate, misleading and false evidence and argument to the jury (with regard to the testimony of Sherry Diggins and Officers McCabe and Kane, to the statements of Arlene Foster, to fingerprint evidence and the results of the polygraph examination given to Stanley Trader).

2. That trial counsel was ineffective at the pre-trial stage in:

—failing to conduct proper discovery;

—failing to investigate the crime scene;

—failing to review fingerprint and ballistic evidence;

—failing to consult and retain forensic experts;

—failing to investigate the background and potential involvement of Stanley Trader;

—failing to investigate the background and potential involvement of Leroy Little;

—failing to investigate previous crimes and incidents at the Sunoco Service Station at Broad and Catherine Streets;

—failing to request a bill of particulars;

—failing to request or move for disclosure from the prosecution;

—failing to provide notice of an alibi defense; and

—failing to challenge the affidavits in support of the warrants pursuant to *Franks v. Delaware.*

3. That trial counsel was ineffective at the trial stage in:

—failing to make an effective opening statement;

—failing to humanize petitioner;

—failing to even suggest the remote possibility to the jury that petitioner was innocent;

—failing to cross-examine prosecution witnesses Stanley Trader, Clarence Sears, Sherry Diggins, Alex Charyton, Detective Kane, Officer McCabe, Assistant Medical Examiner Paul Hoyer and Ballistics expert William Fort;

—failing to effectively cross-examine the prosecution witnesses that were cross-examined;

—failing to present a single witness for the defense, including alibi witnesses; and

—failing to present an effective closing argument.

4. That numerous instances of prosecutorial misconduct occurred entitling him to relief from his convictions, including:

—despite the fact that he had no prior criminal record, the prosecutor erred in producing three witnesses who testified that petitioner received public assistance payments at a vacant lot address, that he was registered to vote under two different names (Otis Loach and Otis Peterkin), and that he

---

1. Integral to each of the claims now being raised is the underlying contention that trial and previous appellate counsel were ineffective in failing to previously raise each issue.

owned two firearms, neither of which were used in the crimes at issue;

—the prosecutor improperly vouched for the strength and veracity of the Commonwealth's witnesses and case;

—the prosecutor improperly urged the jury in his closing argument to "[r]eturn to the values of yester-year";

—the prosecutor improperly used the hearsay testimony of Stanley Trader and Maurice Rogers as substantive evidence in his closing argument.

5. That the trial court gave a defective instruction on "reasonable doubt."

6. That the evidence properly admitted was insufficient to convince any rational trier of fact that Petitioner was guilty of first degree murder beyond a reasonable doubt.

7. That he is innocent.

8. That there was insufficient evidence that Petitioner robbed John Smith. If anything, it was the Sunoco station that was robbed.

9. That the jury's declaration upon and issuance of a single death sentence for two capital murder convictions was in violation of the 8th and 14th Amendments.

10. There were no aggravating factors since the only aggravating factor found, i.e., killing in perpetration of a felony was improper given that there was no evidence that Smith was killed in the course of himself being robbed.

11. The Commonwealth failed to provide adequate notice that it would seek the death penalty as such notice was not given until jury selection.

12. The trial court failed to properly instruct the jury on mitigating factors and how to balance them against the aggravating factors.

13. The trial court failed to explain to the jury that in Pennsylvania a life sentence means a life sentence with no possibility of parole.

14. That the trial court's penalty phase instructions were insufficient and were invalid in that they failed to describe and define the aggravating and mitigating circumstances involved in petitioner's case and how to weigh or balance the factors.

15. That the trial court's sentencing instructions and verdict form created a substantial probability that the jurors thought they would be precluded from considering mitigating matters upon which they were not unanimous.

Previously, via Memorandum and Order dated December 29, 1998, we had dismissed Mr. Peterkin's habeas corpus petition without prejudice as mixed (i.e. containing both exhausted and unexhausted claims) and to allow him the opportunity to raise these last issues before the Pennsylvania state courts by affording the Pennsylvania Supreme Court the time to rule on the propriety of the Philadelphia Common Pleas Court's decision to dismiss his second PCRA petition.[2] The Court of Common Pleas dismissed the petition as premature due to Peterkin's having filed a petition for writ of habeas corpus in this Court. The Pennsylvania Supreme Court, in turn, upheld the decision to dismiss the petition on the grounds that as it was Peterkin's second PCRA petition, it was untimely filed.[3]

---

**2.** Petitioner filed his second request for relief under the Pennsylvania PCRA on January 13, 1997.

**3.** Under the amendment to § 9545 of the PCRA, 42 Pa.C.S. § 9545(b), (enacted November 17, 1995, effective in 60 days) any petition, including a second or subsequent petition, was required to be filed within one year of the date the judgment became final. As Mr. Peterkin's judgment became final on Feb-

Shortly after the Supreme Court issued its most recent decision affirming the dismissal of Petitioner's second PCRA petition, Mr. Peterkin moved to reinstate his federal habeas corpus petition. We granted this request and gave the parties leave to file supplemental briefs on the effect of the Pennsylvania Supreme Court's decision on the now-reinstated federal petition. Not surprisingly, it remains the respondents' position that this Court is barred from considering those issues raised for the first time in Mr. Peterkin's second PCRA petition as those claims have been procedurally defaulted. It is to this argument that we now turn first.

### Discussion

### A. Procedural Default of Mr. Peterkin's Claims.

■ As we discussed in our December, 1998 Memorandum dismissing Mr. Peterkin's habeas corpus petition without prejudice, in the absence of a valid excuse, a prisoner must first present all federal claims to all levels of the state courts before a district court may entertain a federal habeas petition. *Caswell v. Ryan,* 953 F.2d 853, 857 (3d Cir.1992), *cert. denied,* 504 U.S. 944, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992), citing *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). This exhaustion requirement ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions and preserves the role of state courts in protecting federally guaranteed rights. *Id.* Where, however, state procedural rules bar a petitioner from seeking further relief in the state courts, the exhaustion requirement is satisfied because there is an absence of available state corrective process. *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir.2000);

*McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir.1999). *See Also: Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996).

■ However, this is not to say that a federal court may without more, then proceed to consider the merits. To the contrary, claims deemed exhausted because of a state procedural rule are procedurally defaulted, and federal courts may not consider their merits unless the petitioner demonstrates that (1) the procedural rule was not independent and adequate; (2) cause for his failure to comply with state procedural rules and prejudice resulting therefrom; or (3) that a fundamental miscarriage of justice will occur if not considered. *See: Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 260, 109 S.Ct. 1038, 1041–1042, 103 L.Ed.2d 308 (1989); *Wenger v. Frank,* 2001 WL 1042454, 266 F.3d 218 (3d Cir.2001); *Lines v. Larkins, supra; Doctor v. Walters,* 96 F.3d 675, 683 (3d Cir.1996).

■ A state rule provides an independent and adequate basis for precluding federal review of a state prisoner's habeas claims only if: (1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions. *Doctor v. Walters,* 96 F.3d at 683–684. A state procedural ground is not "adequate" unless the procedural rule is "strictly or regularly followed." *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988); *Doctor v. Walters,*

ruary 24, 1987 when the U.S. Supreme Court denied his petition for writ of certiorari, The Pennsylvania Supreme Court reasoned, his

second PCRA petition had not been filed in a timely fashion.

*supra. See Also: Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991). Nevertheless, the Supreme Court has held that if a state supreme court faithfully has applied a procedural rule in "the vast majority" of cases, its willingness in a few cases to overlook the rule and address a claim on the merits does not mean that it does not apply the procedural rule regularly or consistently. *Banks v. Horn,* 126 F.3d 206, 211 (3d Cir.1997), citing *Dugger v. Adams,* 489 U.S. 401, 410, n. 6, 109 S.Ct. 1211, 1217, n. 6, 103 L.Ed.2d 435 (1989). Accordingly, an occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate to procedurally bar advancing a habeas corpus claim in a district court. *Id. See Also: Cabrera v. Barbo,* 175 F.3d 307, 313 (3d Cir.1999). Federal courts should generally determine questions of procedural default according to the habeas waiver law in effect at the time of the asserted waiver. *Doctor v. Walters,* 96 F.3d at 684, citing *Reynolds v. Ellingsworth,* 843 F.2d 712, 722 (3d Cir.1988). *See Also: Banks v. Horn,* 126 F.3d at 212–213.

█ In this case, Mr. Peterkin filed what was his second[4] petition for relief under the Pennsylvania Post Conviction Relief Act, 42 Pa.C.S. § 9541, *et. seq.* on January 13, 1997, some one month after he filed his petition for habeas corpus in this Court. Section 9545(b)(1) of the PCRA clearly and unmistakably provides that

"[a]ny petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final ..." In its decision of December 21, 1998, the Pennsylvania Supreme Court, in reliance upon 42 Pa.C.S. § 9545(b)(1), reasoned that it could not consider the merits of Mr. Peterkin's PCRA petition given that the judgment in his case became final on January 27, 1987 when the U.S. Supreme Court denied certiorari on his direct appeal and he was proceeding on his *second* PCRA application. Thus, the Pennsylvania Supreme Court found that Petitioner was not eligible for the exception to the requirement that the petition be filed within one year of the effective date of the act. *See: Commonwealth v. Peterkin,* 554 Pa. 547, 554–555, 722 A.2d 638, 641 (1998).

Prior to the issuance of this decision however, and as recognized by the U.S. Court of Appeals for the Third Circuit, it was difficult to predict whether the Pennsylvania Supreme Court would disregard the waiver and thus nevertheless consider on the merits claims seeking collateral relief in capital cases.[5] Indeed, in *Banks v. Horn, supra,* a capital case from the Middle District of Pennsylvania decided some nine months after Petitioner here filed his second PCRA, the Third Circuit held that the district court had erred in holding that the petitioner's unexhausted claims were procedurally barred. In so holding, the Court noted:

> We conclude from [*Commonwealth v. Szuchon,* 534 Pa. 483, 633 A.2d 1098

---

**4.** Petitioner's first PCRA petition was filed on September 7, 1989 and the decision by the Philadelphia County Court of Common Pleas to dismiss it was upheld by the Pennsylvania Supreme Court on October 12, 1994. *See: Commonwealth v. Peterkin,* 538 Pa. 455, 649 A.2d 121 (1994).

**5.** In fact, in Mr. Peterkin's own case on direct appeal, the Pennsylvania Supreme Court, af-

ter finding that he had effectively waived his claim that the trial court committed reversible error when it allowed the exclusion of two potential jurors who had expressed reservations about the death penalty, nevertheless went on to address Petitioner's arguments on the merits. *See: Commonwealth v. Peterkin,* 511 Pa. at 310–311, 513 A.2d at 378–379.

(1993), *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352 (1995) and *Commonwealth v. Beasley,* 544 Pa. 554, 678 A.2d 773 (1996) ] that, notwithstanding a procedural bar, it is possible that in a death penalty case the Pennsylvania Supreme Court will not refuse either to entertain a second PCRA petition or to address the claims raised in it. As we explained above, the common pleas court in Banks' second petition apparently thought the same thing as it indicated that despite its determination that the petition was barred "it may well be that the Supreme Court will review its merits. Accordingly, we conclude that the district court erred in finding Banks' unexhausted claims procedurally barred. Although the district court correctly found in *Banks III* that Banks' unexhausted claims do not meet the stated criteria for Pennsylvania courts to consider a second PCRA petition, we believe that *Banks III* did not give adequate recognition to the Pennsylvania Supreme Court cases demonstrating that it effectively looks beyond those criteria in death penalty cases."

126 F.3d at 212–213. Hence, while the Commonwealth appears to be correct that *since* the Pennsylvania Supreme Court declined to review this petitioner's second PCRA on the merits it has consistently applied the waiver and time bar provisions of the PCRA,[6] we cannot find that *at the time Mr. Peterkin filed* his second petition, these provisions were strictly or regularly followed. We therefore must conclude that the waiver and bar provisions of the

PCRA were not, at the time of the filing of the petition at issue in this case, adequate and independent procedural rules. *In accord, Jermyn v. Horn,* 266 F.3d 257 (3d Cir.2001). Accordingly on this habeas petition, we shall consider the merits of the additional claims which Mr. Peterkin raised in his second PCRA application.[7]

**B. Applicability of AEDPA.**

 As a threshold matter, we must determine whether the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") should be applied in this case. In this regard, Petitioner contends that the Act is inapplicable to his request for habeas relief because he initiated his habeas proceedings on June 27, 1995 when he filed his Motion for Appointment of Federal Habeas Corpus Counsel and to Proceed *In Forma Pauperis.* Thus, Petitioner argues, his habeas case was pending on April 24, 1996, the date that AEDPA became effective. It is the Commonwealth's position that it is the date on which Mr. Peterkin actually filed his habeas corpus *petition* which governs the applicability of AEDPA. Since the petition itself was not filed until December 5, 1996, some six months after the Act's effective date, AEDPA applies here.

In essence, AEDPA extensively amended the statutory provisions that regulate federal habeas corpus proceedings, most particularly § 2244 and §§ 2253–2255 of chapter 153 of title 28 of the United States Code, the provisions which govern all ha-

6. *See, e.g., Commonwealth v. Gamboa–Taylor,* 562 Pa. 70, 753 A.2d 780 (2000); *Commonwealth v. Pursell,* 561 Pa. 214, 749 A.2d 911 (2000); *Commonwealth v. Crawley,* 559 Pa. 9, 739 A.2d 108 (1999); *Commonwealth v. Fahy,* 558 Pa. 313, 737 A.2d 214 (1999); *Commonwealth v. Yarris,* 557 Pa. 12, 731 A.2d 581 (1999); *Commonwealth v. Banks,* 556 Pa. 1, 726 A.2d 374 (1999).

7. In view of this finding, we need not address the parties' arguments with regard to whether there existed cause for the petitioner's default and resultant prejudice or whether the refusal to consider the merits of petitioner's claims would result in a miscarriage of justice.

beas proceedings in the federal courts.[8] These new provisions of chapter 153, however, were to be applied only to cases filed after the Act became effective. *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997).

It is on the basis of *Lindh* and *McFarland v. Scott*, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994) that Petitioner argues the inapplicability of AEDPA to this habeas case. In *McFarland*, the U.S. Supreme Court ruled that a capital defendant need not file a formal habeas corpus petition in order to invoke his right to counsel under 21 U.S.C. § 848(q)(4)(B) and to establish a federal court's jurisdiction to enter a stay of execution. The Court therefore concluded that a "post conviction proceeding" within the meaning of § 848(q)(4)(B) is commenced by the filing of a death row defendant's motion requesting the appointment of counsel for his federal habeas corpus proceeding. 512 U.S. at 836, 114 S.Ct. at 2562–2563, 129 L.Ed.2d 642.

Although this appears to be an issue of first impression in the Third Circuit, since the *Lindh* and *McFarland* decisions, a number of courts outside of the Third Circuit have been confronted with the very same argument advanced by Petitioner here. With the exception of the Ninth Circuit, those Courts of Appeals which have had occasion to address the issue of whether the filing by a capital defendant of a Motion for Appointment of Counsel "commences" a habeas corpus proceeding within the meaning of 28 U.S.C. § 2251, *et. seq.* have all uniformly held that the rele-

vant date for determining the applicability of the AEDPA to habeas corpus petitions is the date that the actual habeas corpus petition is filed—not the date on which the motion for appointment of counsel is filed. *See, e.g.: Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir.2000); *Moore v. Gibson*, 195 F.3d 1152 (10th Cir.1999); *Gosier v. Welborn*, 175 F.3d 504 (7th Cir.1999), *cert. denied*, 528 U.S. 1006, 120 S.Ct. 502, 145 L.Ed.2d 387 (1999); *Williams v. Coyle*, 167 F.3d 1036 (6th Cir.1999); *Calderon v. U.S. District Court for the Central District of California*, 163 F.3d 530 (9th Cir.1998), *cert. denied*, 526 U.S. 1060, 119 S.Ct. 1377, 143 L.Ed.2d 535 (1999); *Nobles v. Johnson*, 127 F.3d 409 (5th Cir.1997), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998). We agree with the rationale advanced in *Moore*, *Williams* and *Nobles*, that, in ordinary usage, a case is pending after it is commenced by either filing a complaint or by the service of a summons. Indeed, the filing of a habeas corpus petition is analogous to the filing of a civil complaint in that the Rules of Civil Procedure apply to habeas proceedings to the extent that those rules do not conflict with the specific rules governing § 2254 cases. Likewise, we find that Mr. Peterkin's habeas action was not "pending" until he filed his formal petition for a writ of habeas corpus. *See, Williams v. Coyle*, 167 F.3d at 1038; BLACK'S LAW DICTIONARY 1134 (6th Ed.1990). Accordingly, AEDPA shall be applied in this case.

### C. Standards Governing Habeas Corpus Petitions.

Under 28 U.S.C. § 2254(d),

---

**8.** It is noteworthy that AEDPA also created a new chapter applicable only in capital cases, chapter 154. *Nobles v. Johnson*, 127 F.3d 409, 412–413 (5th Cir.1997). That chapter only applies, however, if a state "opts in" by establishing certain mechanisms for the appointment and compensation of competent counsel. *Id. See Also: Buehl v. Vaughn*, 166

F.3d 163 (3rd Cir.1999). Pennsylvania is not an "opt-in" state for purposes of AEDPA and thus AEDPA's amendments to Chapter 154 of Title 28 do not apply to habeas petitions in capital cases from Pennsylvania. *Death Row Prisoners of Pennsylvania v. Ridge*, 106 F.3d 35 (3rd Cir.1997).

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Moreover, under § 2254(e)(1),

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a capital case from Virginia, the U.S. Supreme Court had occasion to interpret the scope of habeas review established by the AEDPA amendment to § 2254(d)(1):

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 120 S.Ct. at 1523. Stated otherwise, to proceed under the "contrary to" provision, the court must first identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim. *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir.2000). It is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome. This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent. *Id.*, citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir.1999), *cert. denied*, 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999).

Then, if it is determined that the state court decision is not "contrary to" the applicable Supreme Court precedent, the court is required to advance to the second step in the analysis—whether the state court decision was based on an "unreasonable application" of Supreme Court precedent. *Id.* The "unreasonable application" inquiry, in turn, requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Thus, under that clause, a federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Hameen v. State of Delaware*, 212 F.3d 226, 235 (3d Cir.2000), quoting *Williams*, 120 S.Ct. at 1521. Rather, that application must also be unreasonable. *Jermyn v. Horn*, 266 F.3d at 282. *See Also: Rompilla v. Horn*, 2000 WL 964750, 2000 U.S. Dist. LEXIS 9620 (E.D.Pa.2000).

### D. Petitioner's Claims.

1. *That the admission of hearsay testimony violated Petitioner's constitutional right to confront the witnesses against him.*

By this petition, Mr. Peterkin again challenges the trial court's admission of certain statements which were allegedly made by Ronald Presbery to Stanley Trader, Maurice Rogers and Clarence Sears in the hours preceding his death. Specifically, Petitioner contends that not only was this testimony inadmissible hearsay but it further violated his rights under the Confrontation Clause.

 It is well-established that in all state and federal criminal prosecutions, the accused has a right guaranteed by the Sixth and Fourteenth Amendments [9] to the United States Constitution, to be confronted with the witnesses against him. *Lilly v. Virginia*, 527 U.S. 116, 123, 119 S.Ct. 1887, 1893, 144 L.Ed.2d 117 (1999), citing *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting

it to rigorous testing in the context of an adversary proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

While a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, the Supreme Court has held that the Confrontation Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial. *Idaho v. Wright*, 497 U.S. 805, 813–814, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638 (1990); *Webb v. Lane*, 922 F.2d 390, 392 (7th Cir.1991). Indeed, while the Supreme Court has recognized that the hearsay rules and the Confrontation Clause are generally designed to protect similar values and stem from the same roots, the Confrontation Clause bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. *White v. Illinois*, 502 U.S. 346, 353, 112 S.Ct. 736, 741, 116 L.Ed.2d 848 (1992), citing *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970) and *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970); *Idaho v. Wright*, 497 U.S. at 814, 110 S.Ct. at 3146. *See Also: Bourjaily v. United States*, 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987).

In *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980), the Supreme Court set forth a general approach for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause.

---

9. The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides in relevant part:

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

The Court noted that the Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, the clause establishes a rule of necessity such that in the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness has been shown to be unavailable, his statement is admissible only if it bears adequate indicia of reliability. *Idaho v. Wright,* 497 U.S. at 814–815, 110 S.Ct. at 3146. Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. *Id.* In other cases, the evidence must be excluded, at least in the absence of a showing of particularized guarantees of trustworthiness. *Id. See Also: Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

Here, the trial court allowed three witnesses to testify to certain statements which victim Ronald Presbery had purportedly made in the late morning and early afternoon hours on the day he was murdered. Maurice Rogers, an off-duty employee of the Sunoco Station, testified that Mr. Presbery called him at about 11 a.m. on Sunday, November 29, 1981 as he was preparing to leave for church, apparently at the request of Manager John Smith. In the course of this conversation, Mr. Presbery told Mr. Rogers that Mr. Smith was in the back office with Petitioner and that he was getting ready to make a bank deposit. Mr. Smith then spoke with Rogers and asked him how many cash-containing envelopes he had placed into the safe during his shift the preceding night. Smith told him that since he had paperwork to do at the station, he wouldn't

be able to go to church that day and asked Rogers to say a prayer for him. Subsequent to his discussion with Smith, Rogers again spoke with Presbery, who told him that Mr. Peterkin and Mr. Smith were back there testing a gun to which Rogers replied that Smith could get in trouble since the company didn't allow anyone in the station to have guns. Presbery then advised Rogers that Peterkin was then locking the door and getting into Smith's Cadillac. When Rogers asked where Smith was, Presbery told him that he must have gone across the street to get something to eat. (N.T. 9/22/82, 1–13).

Similarly, both Stanley Trader and Clarence Sears testified that at around noon on November 29, 1981, they pulled up to the Sunoco Station at Broad and Catherine Streets and that Ronald Presbery walked over to the ·driver's side of their vehicle and told them that the petitioner, who was in the attendant's booth at that time, had a gun and the dial to the safe.

Given that at the time of Petitioner's trial, Mr. Presbery was dead, it is clear that the Commonwealth amply demonstrated his unavailability. We therefore consider the contested statements to determine whether or not they possess the requisite indicia of reliability, i.e., whether they fall under any of the recognized exceptions to the hearsay rule.

At the time of Petitioner's trial in 1982, Pennsylvania's law on evidence recognized certain exceptions to the hearsay rule, which have largely since been codified and virtually mirror that of the Federal Rules of Evidence.[10] "Hearsay," of course, is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the

---

**10.** The Pennsylvania Supreme Court adopted the Pennsylvania Rules of Evidence on May 8, 1998, effective October 1, 1998.

truth of the matter asserted. *See:* Fed. R.Evid. 801(c); *Tennessee v. Street,* 471 U.S. 409, 413, 105 S.Ct. 2078, 2081, 85 L.Ed.2d 425 (1985); *Commonwealth v. Murphy,* 493 Pa. 35, 43, 425 A.2d 352, 356 (1981). The exceptions to the hearsay rule regardless of the availability of the declarant to testify at trial recognized by both Federal and Pennsylvania law include:

(1) Present Sense Impression.

(2) Excited Utterance.

(3) Then existing mental, emotional or physical condition.

(4) Statements for purposes of medical diagnosis or treatment.

(5) Records of Regularly Conducted Activity.

(6) Records of Religious Organizations.

(7) Marriage, Baptismal and Similar Certificates.

(8) Family Records.

(9) Records of Documents Affecting an Interest in Property.

(10) Statements in Documents Affecting an Interest in Property.

(11) Statements in Ancient Documents.

(12) Market Reports, Commercial Publications.

(13) Reputation Concerning Personal or Family History.

(14) Reputation Concerning Boundaries or General History.

(15) Reputation as to Character.

(16) Admission by Party Opponent.

Fed.R.Evid. 803; Pa.R.Evid. 803. In addition, where the declarant is shown to be unavailable to testify, Pennsylvania and Federal law recognize additional hearsay exceptions for:

(1) Former Testimony.

(2) Statement Under Belief of Impending Death.

(3) Statement Against Interest.

(4) Statement of Personal or Family History.

In this case, the trial court admitted the testimony of Stanley Trader and Clarence Sears as "circumstantial evidence going to show the motive for the crime." It admitted the testimony of Maurice Rogers to show Ronald Presbery's state of mind at the time that he ostensibly heard a gunshot from the station's back office, saw Petitioner lock the door and drive off in Smith's car. On direct review, the Pennsylvania Supreme Court found that although the "state of mind" exception was not applicable to the admission of Rogers' testimony, the testimony was properly admitted under the present sense impression exception. *See, Commonwealth v. Peterkin,* 511 Pa. 299, 312–313, 513 A.2d 373, 379 (1986). The Court further found that, contrary to the trial court's opinion, the admission of Trader's and Sears' testimony regarding Presbery's statements to them was *not* proper under the present sense impression exception given the absence of evidence indicating the amount of time which lapsed between Presbery's observation of a gun and safe dial in Petitioner's possession and his remarks to Trader and Sears.

To constitute a "present sense impression," under Pennsylvania law as it existed at the time of trial, the witness's statements must describe or refer to present physical or emotional states and be made contemporaneously with the event to which the declaration refers. *See: Commonwealth v. Chamberlain,* 557 Pa. 34, 41, 731 A.2d 593, 596 (1999); *Commonwealth v. Pronkoskie,* 477 Pa. 132, 137, 383 A.2d 858, 860 (1978), citing, *inter alia,* McCormick, Evidence, § 297 (2nd Ed.1972); *Commonwealth v. Coleman,* 458 Pa. 112, 326 A.2d 387 (1974). *See Also:* Pa.R.Evid. 803(1). Fed.R.Evid. 803(1) similarly describes the exception as

"[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." There are thus three principal requirements which must be met before hearsay evidence may be admitted as a present sense impression: (1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous. *U.S. v. Mitchell,* 145 F.3d 572, 576 (3d Cir.1998).

■ In applying the definitions of present sense impression under both Pennsylvania and Federal law to the facts of this case pursuant to the standards set forth in 28 U.S.C. § 2254, we can find no error in the findings and conclusions of the Pennsylvania Supreme Court that the testimony of Maurice Rogers fell within that exception while the testimony of Stanley Trader and Clarence Sears did not. Indeed, in reviewing Mr. Rogers' testimony in its entirety, it appears clear that in the telephone conversation between Presbery and Rogers, Presbery was describing the sequence of events which he was then hearing and/or observing, i.e., hearing a gunshot, seeing Petitioner lock the office door, get into Smith's car and drive off, because he wanted to know whether Petitioner should have had a key to the station. We agree with the Supreme Court that Presbery's statements were made contemporaneously to his observations and therefore possessed the necessary indicia of reliability to be admissible under the present sense impression exception. Accordingly, we cannot find that the state court's decision with respect to the admissibility and inadmissibility of these statements was contrary to or involved an unreasonable application of clearly established Federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state proceedings.

■ However, we do not reach the same conclusion with regard to the testimony of Trader and Sears. To be sure, we can find no evidence in the record of this case to demonstrate that the statements made by the victim to these witnesses bear the "adequate indicia of reliability" pre-requisite to admissibility. Thus while we find no basis upon which to grant habeas relief to Petitioner for the testimony of Maurice Rogers, we do find that Mr. Peterkin's rights under the Confrontation Clause were violated by the admission of Presbery's statements to Sears and Trader. Accordingly, we must now consider the correctness of the Supreme Court's conclusion that the admission of the hearsay testimony from Messrs. Trader and Sears constituted harmless error beyond a reasonable doubt. *See,* N.T. 9/21/82, pp. 1–20; *Commonwealth v. Peterkin,* 511 Pa. 299, 313–315, 513 A.2d 373, 380–381 (1986).

In its decision on this issue, the Pennsylvania Supreme Court applied the standards for determining whether trial error is harmless set forth in *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978):

"This Court has stated that an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. .... Under this approach, a reviewing court first determines whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt. If 'honest, fairminded jurors might very well have brought in not guilty verdicts,' an error

cannot be harmless on the basis of overwhelming evidence. . . . . Once the court determines that the evidence of guilt is overwhelming, it then decides if the error was so insignificant by comparison that it could not have contributed to the verdict. . . . Our cases support the proposition that in deciding whether an error is harmless because there is properly admitted evidence of guilt the untainted evidence relied upon must be uncontradicted . . . . (citations omitted)." *Peterkin,* 511 Pa. at 313–314, 513 A.2d at 380, quoting *Story,* 476 Pa. at 412–413, 383 A.2d at 166.

 The standard for determining whether or not error is harmless such as to foreclose relief on a petition for habeas corpus, however, is slightly different. Instead, the inquiry required of a habeas court is whether, in light of the record as a whole, the alleged error had a substantial and injurious effect or influence in determining the jury's verdict. *Calderon v. Coleman,* 525 U.S. 141, 146–147, 119 S.Ct. 500, 503–504, 142 L.Ed.2d 521 (1998); *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993); *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). It should be noted that constitutional errors have been categorized as one of two types: structural error or trial error. *Yohn v. Love,* 76 F.3d 508, 522 (3d Cir.1996). A structural error is a defect in the trial mechanism itself, affecting the entire trial process and is *per se* prejudicial. *Id.,* citing *Arizona v. Fulminante,* 499 U.S. 279, 309–310, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991). Trial error occurs during the presentation of the

case to the jury and may be quantitatively assessed in the context of all other evidence; thus trial errors are subject to a harmless error analysis. *Id.* Moreover, when a federal judge in a habeas proceeding is in grave doubt[11] about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict," that error is not harmless and the petitioner must win. *O'Neall v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995). *See Also: California v. Roy,* 519 U.S. 2, 4–5, 117 S.Ct. 337, 338, 136 L.Ed.2d 266 (1996).

It has further been held to be inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. Rather, the correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error. *Hassine, supra,* citing *Yohn,* 76 F.3d at 523.

 Viewing this improper hearsay testimony in the context of the other evidence and the preceding principles, we note that this was not the only instance of "harmless trial error" which the Pennsylvania Supreme Court found. To be sure, the Supreme Court on direct review also found that the testimony of one Diana Dunning that she saw the petitioner in possession of a gun other than the murder weapon some two days before the murders took place was irrelevant and thus not properly admitted. *Commonwealth v. Peterkin,* 511 Pa. at 315–316, 513 A.2d at 381. Additionally, on petitioner's first PCRA

---

11. "Grave doubt" exists when, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error. *O'Neal,* 513 U.S. at 435, 115 S.Ct. at 994. In those situations, the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict, i.e., as if it had a substantial and injurious effect or influence in determining the jury's verdict. *Id.; See Also: Hassine v. Zimmerman,* 160 F.3d 941, 955 (3d Cir.1998).

petition, the Supreme Court found that: "[w]hen the prosecutor requested that the jury be as cold and ruthless as the appellant was when he murdered his victims, the prosecutor went beyond the appropriate oratorical boundaries and defense counsel should have objected to the statements." *See: Commonwealth v. Peterkin,* 538 Pa. at 464–465, 649 A.2d at 125. Again, under 28 U.S.C. § 2254(e)(1), a determination of a factual issue made by a State court shall be presumed to be correct and it is the applicant who bears the burden of rebutting the presumption of correctness by clear and convincing evidence. For purposes of this analysis, then, we shall presume that the Supreme Court was correct in these findings, save for its determination that these instances of error, too, were harmless.

In application and careful consideration of all of the foregoing, we find that we are in grave doubt as to the harmlessness of the hearsay testimony of Stanley Trader and Clarence Sears, the testimony of Diana Dunning and the prosecutor's argument. Indeed, Mr. Presbery's statements that petitioner was in the station attendant's booth with a gun and the dial to the safe was admitted not once but twice—through the testimony of both Trader and Sears. Mr. Trader was asked about Mr. Presbery's remarks to him on some three separate occasions during his direct examination by the Commonwealth's attorney, yet a cautionary instruction was only given to the jury on one of these occasions. What's more, the hearsay testimony was also referred to as substantive evidence in the prosecutor's opening statement and closing argument. It was yet again presented at the sentencing phase of the trial when the jury considered whether to impose the death penalty. (N.T. 9/20/82, 18–19, 9/21/82, 21–23, 30, 34, 71–72, 9/24/82, 39–41, 146–151).

Moreover, in the absence of the evidence "harmlessly" improperly admitted, we find that the only evidence linking Petitioner to the Sunoco station on the day of the crime consisted of: (1) Maurice Rogers' testimony regarding his Sunday morning conversations with Smith and Presbery; (2) Stanley Trader's testimony that when he spoke with the petitioner at the station at approximately 4:15 p.m. on November 29, 1981, Petitioner told him that Presbery had left with some other people in a car; and (3) Sherry Diggins' testimony that on the night of the murders, Petitioner came to her apartment with some $600 in envelopes, gave her the murder weapon (a .32 caliber Smith and Wesson revolver) and asked her to destroy the envelopes and a lot of spent shells. While this testimony is admittedly damning to Petitioner, we cannot concur with the state court that it constitutes "overwhelming evidence" of Petitioner's guilt. To be sure, there were various inconsistencies in Diggins' and Trader's testimony, Stanley Trader had himself been convicted of burglary some three years previously, and Coy Gibson testified that he saw and spoke with Presbery at the station between 4:30 and 5:00 p.m. on the day of the murders at which time he and Presbery were the only ones there. (N.T. 9/20/82, 33–34, 62–63). *See Also: Peterkin,* 538 Pa. at 464–465, 649 A.2d at 125. Accordingly, under *Brecht* and *O'Neal,* both *supra,* we cannot agree with the findings and conclusions of the state courts that the admission of this evidence was "harmless error." We therefore find that the decisions of the Pennsylvania state courts to first admit this hearsay testimony and to later find its admission to be harmless error were contrary to and involved an unreasonable application of clearly established Federal law. Mr. Peterkin is entitled to habeas corpus relief on the basis of this improperly admitted evidence.

2. *That Petitioner's constitutional rights were violated as the result of prosecutorial misconduct during the guilt/innocence stage of his trial.*

(a) That the prosecutor engaged in misconduct by introducing evidence of uncharged crimes.

In addition to Diana Dunning's testimony that she saw the petitioner with a gun (not the murder weapon) two days before the crimes, Petitioner contends that the Commonwealth also adduced evidence that he had committed two other, uncharged and unrelated crimes—welfare fraud and voter fraud. In so doing, Petitioner argues, the Commonwealth violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution and trial and appellate counsel were ineffective for failing to raise these issues at trial and on direct review.

The appropriate standard of review on habeas corpus for a claim of prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Id.,* citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Accordingly, the Supreme Court has instructed federal courts reviewing habeas claims brought by state prisoners and premised upon prosecutorial misconduct in summation to distinguish between ordinary trial error of a prosecutor and that sort of egregious misconduct amounting to denial of constitutional due process—the question is thus whether the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair. *Floyd v. Meachum,* 907 F.2d 347, 353 (2nd Cir.

1990). *See Also: Kontakis v. Beyer,* 19 F.3d 110, 120 (3d Cir.1994); *Keller v. Larkins,* 89 F.Supp.2d 593, 604 (E.D.Pa.2000), *aff'd* 251 F.3d 408 (3d Cir.2001).

Similarly, in some circumstances, the admission of evidence in a state criminal proceeding can rise to the level of a constitutional error. In such cases, the petitioner must show that the "use of the evidence" caused "fundamental unfairness" in violation of due process. *Kontakis, supra.,* citing *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). *See Also: Bisaccia v. Attorney General,* 623 F.2d 307, 312 (3d Cir.1980), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980); *Keller v. Larkins,* 89 F.Supp.2d at 604. However, just as "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice, not every error in balancing probative value against prejudicial effect amounts to error which rises to constitutional dimensions." *Lesko v. Owens,* 881 F.2d 44, 51 (3d Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990) quoting *United States ex rel. Perry v. Mulligan,* 544 F.2d 674 (3d Cir.1976), *cert. denied,* 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977) and *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431(1974).

To constitute the requisite denial of fundamental fairness sufficient to issue a writ of habeas corpus, the erroneously admitted evidence must be "material in the sense of a crucial, critical, highly significant factor," and the probative value of the evidence must be so conspicuously outweighed by its inflammatory content that a defendant's constitutional right to a fair trial has been violated. *Lesko v. Owens,* 881 F.2d at 52; *Robinson v. Vaughn,* 1995 WL 572177 at

*3 (E.D.Pa.1995), quoting *Jameson v. Wainwright*, 719 F.2d 1125, 1127 (11th Cir. 1983), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990). In conducting this inquiry, the federal court must accord great deference to the state trial court given that it is in a unique position to assess the relative probative value and inflammatory effect of proffered testimony. *Id.*, citing *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir.1986). It should be noted that evidence may be unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise may cause a jury to base its decision on something other than the established propositions in the case. *Lesko v. Owens*, 881 F.2d at 55.

In this case, Detective Robert Kane testified without objection that he determined that Otis Peterkin was also known as Otis Loach, Jr. because a check of the voter registration records revealed that there was an Otis Loach, Jr. and an Otis Peterkin registered to vote at 1536 Clearview Street in Philadelphia. (N.T. 9/21/82, 157–158; 9/22/82, 35–36). Additionally, immediately after the Custodian of Records from the Department of Public Assistance testified that Otis Peterkin was receiving welfare payments of $87.40 every two weeks at an address of 5522 Green Street, Detective Kane again testified without objection that 5522 Green Street was, in fact, a vacant lot. (N.T. 9/22/82, 18–19, 23; 36). Subsequent to this testimony, the petitioner, through his trial counsel, stipulated that he was on public assistance using the address 5522 Green Street for October, November and early December, 1981 and that he was also known as Otis Loach, Jr. (N.T. 9/21/82, 158; 9/22/82, 94–95).

 Under Pennsylvania law, evidence of other unrelated crimes is generally inadmissible to prove the commission of a crime unless it is being offered to prove (1) motive, (2) intent, (3) a common scheme or plan involving the commission of two or more crimes so closely related that proof of one tends to prove the other, (4) the identity of the perpetrator or (5) the absence of mistake or accident. *Lesko v. Owens*, 881 F.2d at 52 citing *Commonwealth v. Styles*, 494 Pa. 524, 525–526, 431 A.2d 978, 980 (1981). In addition, "other crimes" evidence, though relevant, must be excluded if the probative value is outweighed by the danger that the facts offered may unduly arouse the jury's prejudice or hostility. *Id.* While the evidence regarding petitioner's welfare status was relevant and probative of his financial status at the time and possible motive for the robbery, we can find no relevance or probative value to his voter registration records or to the address at which he received his welfare payments, nor was it offered under any of the foregoing five "MIMIC" exceptions.

Had this evidence merely been admitted without more, we would not have found that its admission was sufficient to rise to the level of a constitutional violation. However, despite the parties' stipulations to Petitioner's identity and receipt of welfare, the prosecutor specifically argued that Petitioner committed welfare fraud in his closing argument. (N.T. 9/24/82, 41–42, 44). By so doing, we find that the Commonwealth attached such additional weight to this evidence as to shift the balance in favor of its inflammatory and unfairly prejudicial content and away from its probative value. We thus conclude that Mr. Peterkin's constitutional right to a fair trial has been violated by the admission of this evidence as well.

(b) That the Petitioner's constitutional rights were violated when the prosecutor commented on his right to remain silent during his closing argument to the jury.

 Petitioner also argues that the prosecutor made two separate references

**366**

to his constitutional right to remain silent during his closing argument to the jury and that in so doing, violated his rights under the Fifth and Fourteenth Amendments.

The Fifth Amendment provides, in relevant part that "[n]o person shall ....be compelled in any criminal case to be a witness against himself ..." The U.S. Supreme Court has held that "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233 14 L.Ed.2d 106 (1965); *U.S. v. Balter,* 91 F.3d 427, 441 (3d Cir.1996), *cert. denied,* 519 U.S. 1011, 117 S.Ct. 517, 136 L.Ed.2d 406 (1996). It is thus the normal rule in a criminal case that no negative inference from the defendant's failure to testify is permitted; this rule applies in both the guilt and penalty phases of a trial. *Mitchell v. U.S.,* 526 U.S. 314, 119 S.Ct. 1307, 1314–1315, 143 L.Ed.2d 424 (1999). The Third Circuit's well-established test for determining whether a prosecutor's remark violates *Griffin* is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Lesko v. Lehman,* 925 F.2d 1527, 1544 (3d Cir.1991), quoting *Bontempo v. Fenton,* 692 F.2d 954, 959 (3d Cir.1982) and *United States v. Chaney,* 446 F.2d 571, 576 (3d Cir.1971). In making this determination, the challenged prosecutorial remark must be examined in its trial context. *Id.,* citing

*United States v. Robinson,* 485 U.S. 25, 31–33, 108 S.Ct. 864, 868–870, 99 L.Ed.2d 23 (1988) and *Lockett v. Ohio,* 438 U.S. 586, 595, 98 S.Ct. 2954, 2959, 57 L.Ed.2d 973 (1978).

Here, the prosecutor's closing argument included the following:

> ... Maybe, you say that the Commonwealth didn't show that but the same man that gave the address to a vacant lot in Germantown to get Public Assistance. Who is deceiving who, as he sits there today, calmly in a suit, passive and cool, protected by the laws of the Commonwealth, protected by the laws encompassed in the Bill of Rights? No one begrudges him that, ladies and gentlemen, but let's think about the two people that are not here....

> ... Oh yes, he is passive here now but the destruction that he wreaked, or visited on two human beings in a civilized society, I hope we can't tolerate this....

(N.T. 9/24/82, 44, 51).

In evaluating this argument in conjunction with the preceding legal principles, we can reach no other conclusion but that these prosecutorial remarks were so prejudicial that they, together with the other improprieties, rendered the trial in question fundamentally unfair. While we would agree with the Commonwealth that had the prosecutor merely used the term "passive" to describe Petitioner, his argument could have been construed as a suggestion that the jury should not be swayed by his unthreatening present demeanor in determining whether the evidence would support a verdict that he killed two people.[12] (*See:* Commonwealth's Response to Petition for Writ of Habeas Corpus, at p.

---

**12.** We do agree, however, that this was the appropriate interpretation of the prosecutor's remarks at sentencing when he said "[s]end out a message about the conduct engaged in by that man as he sits passively at that table,

[that it] cannot be condoned among civilized men." (N.T. 9/24/82, 160). Accordingly, we find no error in this portion of the prosecutor's sentencing argument.

48, n. 35). However, the prosecutor here went far beyond merely contending that the petitioner's present demeanor was passive. To the contrary, these remarks clearly implied that by dressing in a suit, sitting calmly and passively and invoking his right to remain silent throughout his trial, the petitioner was trying to deceive the jury. That these remarks were made immediately after the prosecutor's remarks concerning Petitioner's alleged welfare fraud only serves to further emphasize the inference that Mr. Peterkin's goal in not testifying was to deceive the members of the jury panel.

Furthermore, in considering whether or not the admission of these remarks constituted harmless error in the context of the record as a whole and notwithstanding the trial court's instruction that the speeches of counsel were only to be considered to the extent that they were supported by the evidence, we again find that we have grave doubt that these remarks did not have a substantial and injurious influence on the jury's verdict. *Calderon v. Coleman*, and *O'Neal v. McAninch*, both *supra*. Accordingly, we must find that the error was not harmless and that these statements present still additional grounds for habeas corpus relief.

(c) That the prosecutor engaged in misconduct in violation of Petitioner's constitutional rights when he urged the jury to return to the values of yesteryear.

■ Mr. Peterkin next challenges the prosecutor's contentions (also contained in his closing argument) that:

"Once upon a time, ladies and gentlemen, in this country a dollar used to be made of silver. A coke was a cola. A joint was a bad place to be. A Ford or Chevy would last for ten years but now they don't.... Let's go back to that time, ladies and gentlemen. Let's go back to when life meant something.

Let's go back to that point when a man earned his keep, when a man got a day's pay for a day's work and there was no such thing as living behind walls, that is living behind bars, living in fear and as Mr. Presbery said, Ronald said, this is a bad neighborhood ..."

It is, of course, clear that a prosecutor's comments are properly directed to an understanding of the facts and of the law rather than to passion and prejudice and may not appeal to the jury's fears and emotions. *Hennon v. Cooper*, 109 F.3d 330, 333 (7th Cir.1997), *cert. denied*, 522 U.S. 819, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997); *Lesko v. Lehman*, 925 F.2d at 1545; *Hance v. Zant*, 696 F.2d 940, 951 (11thth Cir.1983), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983); *United States ex rel Perry v. Mulligan*, 544 F.2d at 680. However, taking the foregoing remarks as a whole, which we must, we cannot find that they are so inflammatory or prejudicial as to rise to the level of a constitutional violation. While there may have been scant evidentiary support for the prosecutor's exhortation to return to the 'good old days,' we are confident that the judge's admonition that the jurors were to consider these remarks in the context of their own recollection of the evidence presented would have been sufficient to mitigate the limited extent to which they constituted an unnecessary appeal to their emotions. We thus do not find that these comments rendered the trial fundamentally unfair and habeas relief on the basis of this portion of the prosecutor's closing shall be denied.

(d) That the prosecutor engaged in misconduct in violation of Petitioner's constitutional rights when he used the hearsay testimony of Rogers, Trader and Sears as substantive evidence in his closing argument to the jury.

■ Again, it is axiomatic that prosecutorial misconduct does not always war-

rant the granting of relief. *U.S. v. Zehrbach,* 47 F.3d 1252, 1265 (3d Cir.1995), *cert. denied,* 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995). Indeed, the Supreme Court has acknowledged that given the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. *Id.,* citing *United States v. Hasting,* 461 U.S. 499, 508–509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). In deciding whether the prosecution has improperly commented at trial, the court should look to the overall context of the statements in the trial record. *U.S. v. Mastrangelo,* 172 F.3d 288, 297 (3d Cir.1999) citing *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Improper prosecutorial comments may lead the jury to infer that the prosecutor knows undisclosed facts which he could not present to the jury. *Id. See Also: United States v. Walker,* 155 F.3d 180, 186 (3d Cir.1998). Similarly, a prosecutor's summation should be limited to the facts in evidence and all reasonable inferences derived therefrom. *Commonwealth v. Moretti,* 358 Pa.Super. 141, 148, 516 A.2d 1222, 1225 (1986). *See Also: Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.,* 63 F.3d 1267, 1274 (3d Cir.1995). Where powerfully incriminating hearsay statements are admitted into evidence and offered again in closing argument, the risk of prejudice is amplified. *See: United States v. Reynolds,* 715 F.2d 99, 105 (3d Cir.1983).

■ Here, we concluded *infra* that while the hearsay statements made by Ronald Presbery to Maurice Rogers were properly admitted under the present sense impression to the hearsay rule, the statements which Presbery made to Stanley

Trader and Clarence Sears were not. Although the trial court did give a cautionary instruction to the jury that they were only to consider Maurice Rogers' testimony on this point as evidence of Mr. Presbery's state of mind at the time, the prosecutor in his closing argument nevertheless urged the members of the jury to accept this testimony as substantive evidence that Mr. Peterkin had a gun and the dial to the safe, that he and Mr. Smith had been testing a gun in the back office and that almost immediately thereafter he had locked the back office door and driven off in John Smith's car.

Under the standards enunciated above, we could find this error to have been harmless in and of itself. However, the prosecutor did not stop there. Rather, he then went on to argue that:

> I would submit to you, ladies and gentlemen, that you saw how he got the combination to that safe. You saw the body beneath the sign and you heard Dr. Hoyer talk about the nine shots, the nine painful shots as he lay twitching on the floor. You think about that ... and "[t]he target practicing that Mr. Presbery heard was when Mr. Smith met his end." (N.T. 9/24/82, 40–41, 47).

Once again taking these comments and viewing them in the light of the record as a whole, we believe it highly likely that the manner in which the prosecutor used this evidence in his closing argument had a substantial and injurious influence in the determination of the verdict in this case, despite the trial judge's cautionary directives regarding Mr. Rogers' testimony in his closing instructions. (N.T. 9/24/82, 67). So saying, we find that habeas relief is merited on this basis as well.[13]

---

13. We note that the prosecutor also incorporated by reference into the sentencing portion of the trial "the testimony of Mr. Maurice Rogers, specifically about the telephone conversation that he had with Ronald Presbery wherein Mr. Presbery indicated the number

(e) That the prosecutor engaged in misconduct when he vouched for the integrity of the Commonwealth's case.

■ Mr. Peterkin next argues that the prosecutor acted improperly in arguing that "[t]he experts in this case, Dr. Hoyer, Mr. Fort, they have done everything that they can do. The detectives, the uniformed police officers, they have done everything that they can do ..." (N.T. 9/24/82, 36). We disagree.

■ Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury and has been held to be impermissible. *United States v. Dispoz–O–Plastics, Inc.*, 172 F.3d 275, 283 (3d Cir.1999), citing, *inter alia, United States v. Walker*, 155 F.3d 180, 184 (3d Cir.1998); *United States v. Molina–Guevara*, 96 F.3d 698, 703 (3d Cir.1996). Vouching is distinguishable from a personal opinion based on the evidence presented at the trial. *Id. See Also: United States v. Zehrbach*, 47 F.3d at 1266–67.

In examining this portion of the prosecutor's argument in context, we believe that it is most likely interpreted as meaning nothing more than that at that point in time the case was then in the jury's hands: the police investigation had been concluded, the evidence was presented and that it was then up to the jury to decide whether it was the petitioner who committed the crimes with which he was charged. To be

sure, this statement was immediately preceded by the prosecutor's commencement of his closing address by stating that "[t]his is my last opportunity to speak to you concerning the facts in the case of Commonwealth of Pennsylvania versus Otis Peterkin, also known as Otis Loach," and was immediately followed by his admonishment that "[i]t is now up to you. It is now up to you to decide what happened inside of that Sunoco station." While it is certainly possible that the jury could have construed these remarks to mean that the Commonwealth's agents had done the best job possible, we simply find no evidentiary support for Petitioner's argument that these comments automatically "equated" with his guilt. Petitioner's request for habeas relief on this ground is denied.

3. *That Petitioner's constitutional rights were violated by prosecutorial misconduct during the sentencing stage.*

As noted above, Mr. Peterkin also alleges that several instances of prosecutorial misconduct during the sentencing phase of his trial operated to deprive him of his constitutional rights. While we previously found prosecutorial misconduct with respect to the prosecutor's use of the hearsay testimony as substantive evidence but no error with regard to his use of the term "passively" at the sentencing stage (See notes 12 and 13, both *supra.*), we turn now to Petitioner's remaining assignments of error on this point.

of people who were present, one of which was the Defendant and that portion of the testimony as it relates to what was happening in the office, that Mr. Smith was in the office counting money and Mr. Peterkin was back there with him and they were target practicing ..." and ... "testimony of Mr. Sears and Mr. Trader ..., that testimony being that Ronald Presbery indicated to them that the Defendant was in the booth with a gun and the combina-

tion to the safe ..." (N.T. 9/24/82, 146–147). Although defense counsel objected and requested another cautionary instruction, the trial court refused. (N.T. 9/24/82, 150–151). For the same reasons outlined above, we find that the petitioner is entitled to habeas corpus relief for the prosecution's improper use of the hearsay statements of Trader, Sears and Rogers in the sentencing portion of his trial.

As the Third Circuit observed in *Lesko v. Lehman, supra.,*

> The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system. It is *clearly* the most critical legal proceeding from the standpoint of the defendant whose life is at stake. Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices.

925 F.2d at 1541 citing *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

(a) The prosecutor committed misconduct by opining to the jury as to how the victims would have testified had they lived.

■ Petitioner here first argues that the prosecutor improperly opined as to what the testimony of his best witnesses, the victims, would have been if they had lived. The Commonwealth, in turn, contends that this portion of Mr. King's argument was only made in response to the defense allegation that the Commonwealth could not prove as an aggravating circumstance that one of the victims (Presbery) was killed to prevent him from testifying about the death of the other victim (Smith). In reviewing the argument in light of the record as a whole, we again cannot agree with the Commonwealth.

In *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court noted:

> It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the conduct of prosecutors is circumscribed, the interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders.... Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case.... Defense counsel, like his adversary, must not be permitted to make unfounded and inflammatory attacks on the opposing advocate.....

and thus,

> In order to make an appropriate assessment [of prosecutorial misconduct claim] the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.

470 U.S. at 8, 12–13, 105 S.Ct. at 1042, 1045. *See Also: United States v. Robinson,* 485 U.S. at 29–30, 108 S.Ct. at 867 and *Werts v. Vaughn, supra.*

In this case, although we accept that the prosecutor's remarks were made in response to and in rebuttal of a portion of defense counsel's closing, he nevertheless went further in his argument than was necessary to refute defense counsel's argument. Specifically, the defendant's attorney argued:

> Mr. King has told you the three areas with respect to aggravation that he wants you to consider in this instance and I would like to submit to you for your consideration the fact that the first aggravating circumstance dealing with the killing of a witness or a Commonwealth witness to prevent him from testifying before a Grand Jury or a criminal proceeding is not necessarily present in this case. You have two separate murders. There is no indication with respect to whether one or the other is a

Commonwealth witness in another felony or a murder by the Defendant.

(N.T. 9/24/82, 153–154).

The Assistant District Attorney then responded:

"... The killing was in the perpetration of a felony. You have already found that. That, in and of itself, would be enough. However, we are asking you to just look at Commonwealth's Exhibit 22A and 23 A. When someone takes a gun and pumps that number of bullets, fifteen in Ronald Presbery, nine into John Smith—Mr. Lorusso argues we can't prove the order. Our best witnesses are not here. I'm sure if Mr. Smith was here or Mr. Presbery was here they would tell you that it was not my choice to go this way, it was not my choice to go in that kind of pain ..." (N.T. 9/24/82, 159).

Had Mr. King ended his dissertation by simply noting that the Commonwealth's best witnesses weren't there, our finding here would be otherwise. However, in making the additional remarks about the number of bullets in each victim's body and alleging that each of the victims would also have testified to the pain with which they died, the prosecutor overstepped his bounds. We once again find that, in the context of the entire closing statements and record evidence, these remarks also contributed to the denial of Petitioner's rights to due process by unfairly prejudicing the jury and that the Pennsylvania Supreme Court's finding that this constituted harmless error was an unreasonable application of the law to the facts of this case. *See, Werts v. Vaughn,* 228 F.3d at 197; *Ramseur v. Beyer,* 983 F.2d 1215, 1239 (3d Cir.1992), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).

(b) That the prosecutor engaged in misconduct when he asked the jurors to "send out" a message about Petitioner's conduct.

■ Mr. Peterkin next challenges the following remarks by the Assistant District Attorney at the conclusion of his closing argument in the sentencing portion of his trial:

"... What we are asking for is for you to say stop. Send out a message about the conduct engaged in by that man as he sits passively at that table, cannot be condoned among civilized men. Tell him what you did, when you did it, how you did and for the reason that you did it you must die."

(N.T. 9/24/82, 160).

■ It is improper for a prosecutor to suggest to a jury that it has a "duty to even the score," to direct his comments to passion and prejudice rather than to an understanding of the facts and of the law or to appeal to the jury to act as the conscience of the community. *United States v. Beasley,* 2 F.3d 1551, 1560 (11th Cir.1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2751, 129 L.Ed.2d 869 (1994); *Lesko v. Lehman,* 925 F.2d at 1545, citing, *inter alia, Rogers v. Lynaugh,* 848 F.2d 606, 611 (5th Cir.1988) and *United States ex rel. Perry v. Mulligan, supra. See Also: United States v. Gross,* 961 F.2d 1097 (3d Cir.1992).

In reviewing the complained-of statements in the light of the record as a whole, we agree with the Pennsylvania Supreme Court's finding that there was no impropriety here. Read in its entirety, the message which the prosecutor asked the jury to deliver by their verdict was not to society as a whole, but to the defendant as an individual. We thus find no grounds meriting habeas relief on this point.

(c) That the prosecutor engaged in misconduct when he commented on the role of mercy in the jury's sentencing decision and denigrated petitioner's mitigating evidence.

 While he must be careful not to infect a trial with unfairness, a prosecutor may properly counsel the jury to avoid emotional responses not rooted in the trial evidence and can argue in favor of the purposes of the death penalty, including the objectives of retribution and deterrence. *See: Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. at 2471; *Lesko v. Lehman,* 925 F.2d at 1545. He may not direct his comments, however, to passion and prejudice rather than to an understanding of the facts and of the law nor may he misstate the law. *Id.,* citing *United States ex rel. Perry v. Mulligan,* 544 F.2d 674, 680 (3d Cir.1976), *cert. denied,* 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977).

 To state that mercy towards a defendant in a capital case contravenes the law or is frowned upon by the Supreme Court strikes at the core of the jury's role in capital sentencing. *Drake v. Kemp,* 762 F.2d 1449, 1460 (11th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986). Thus, the suggestion that mercy is inappropriate is not only a misrepresentation of the law but withdraws from the jury one of the most central sentencing considerations, the one most likely to tilt the decision in favor of life. *Id. See Also: Lesko,* 925 F.2d at 1545. Stated otherwise, while the prosecutor may argue that mercy is not warranted by the facts of a certain case and the history of a particular defendant, when the prosecutor argues that it is mercy itself that is inappropriate, the jury is improperly told that the concept of mercy—the most significant factor which might point toward a choice of life imprisonment, is illegitimate. *Wilson v. Kemp,* 777 F.2d 621, 624 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *Buttrum v. Black,* 721 F.Supp. 1268, 1318 (N.D.Ga.1989).

Petitioner here also takes exception to the following portions of the prosecutor's closing argument at sentencing:

... Counsel tells you that there was no significant history of prior criminal conduct. What assurance is that to John Smith after fifty-nine years because this Defendant wanted to take what was not his, or Ronald Presbery as this Defendant stood over him in the words of Dr. Hoyer with both of their hands above their head and mercilessly pumped bullets into their body. I would say to you, come back, upon looking at what this Defendant did, break the mold. He is asking you to be humane. Was he humane? He is asking you to take into consideration something that you didn't hear. You heard nothing about mercy in this case. Mercy has no part in your deliberation ... (N.T. 9/24/82, 159–160).

Had the prosecutor concluded this portion of his closing by noting that the jury did not hear anything about mercy in this case, we could have found that he was doing nothing more than directing the jury's attention to the manner in which the crimes were committed and thus arguing that under the facts presented, mercy should not be shown. Instead he argued that the jurors could not apply the concept of mercy. We therefore find that the findings of the Pennsylvania state courts that this argument properly fell within the latitude normally afforded a prosecutor were contrary to and involved an unreasonable application of clearly established Federal law. Accordingly after again evaluating these comments in the context of the whole, we find that the prosecutor's argument was excessive and that he overstepped the boundaries into the realm of

constitutional error warranting the grant of habeas relief.

(d) That the prosecutor engaged in misconduct when he expressed his personal belief in the propriety of a death sentence in Petitioner's case.

▌ Mr. Peterkin next challenges the following portion of the prosecutor's closing argument at sentencing:

"I'm not asking you, ladies and gentlemen, to do anything that I wouldn't do. I'm not asking you to do anything that any reasonable person wouldn't do under the circumstances ..." (N.T. 9/24/82, 159–160).

▌ It is well-settled that an attorney's personal opinions are irrelevant to a sentencing jury's consideration and that to the extent that the prosecutor's arguments reflect such personal beliefs, they are improper. *Johnson v. Wainwright,* 778 F.2d 623, 630 (11th Cir.1985). *See Also: Commonwealth v. D'Amato,* 514 Pa. 471, 489, 526 A.2d 300, 309 (1987); *Commonwealth v. Bricker,* 506 Pa. 571, 487 A.2d 346 (1985). In applying this principle to and in considering the foregoing comments in view of the record as a whole, we cannot find that they represented an improper expression by the prosecutor of his own personal opinions. Rather we find that the prosecutor, after acknowledging that death is a difficult verdict to reach, properly argued that the facts and circumstances under which these crimes were committed could reasonably support a verdict of death and that it would be reasonable to return just such a sentence. We therefore deny Petitioner's request for habeas relief on the basis of this portion of the closing argument.

(e) That the prosecutor engaged in misconduct when he argued Petitioner's future dangerousness to the jury.

▌ Specifically, Petitioner argues that the following excerpt from the prosecution's closing argument at sentencing deprived him of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments:

" ... You have made a finding. You have followed the law. Continue to follow the law and as reasonable people from the community if you could say oh, this was a one-time thing, a one-time thing, sure, it was a one-time thing for John Smith. He is not here any more. It's a one-time thing for Ronald Presbery. It was him who was almost half the age of Mr. Smith. He is not here any more ..." (N.T. 9/24/82, 160).

The U.S. Supreme Court has approved a jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system. *Simmons v. South Carolina,* 512 U.S. 154, 162, 114 S.Ct. 2187, 2193, 129 L.Ed.2d 133 (1994). *See Also: Calderon v. Coleman, supra; O'Dell v. Netherland,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). Accordingly, we find nothing erroneous or unconstitutionally harmful in this portion of the prosecutor's closing remarks.

4. *That Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment Rights were Violated by Trial Counsel's Ineffectiveness at Trial.*

▌ The Supreme Court has found that while the Due Process clauses of the Fifth and Fourteenth Amendments guarantee a fair trial, the basic elements of a fair trial are defined by the Sixth Amendment. *Strickland v. Washington,* 466 U.S. 668, 684–685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). A fair trial is one in which evidence subject to adversarial test-

ing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding and the right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment since access to counsel's skill and knowledge is necessary to accord defendants "the ample opportunity to meet the case of the prosecution" to which they are entitled. *Id.*, citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 276, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942) and *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932). The special value of the right to the assistance of counsel explains why it has long been recognized that the right to counsel is the right to the effective assistance of counsel. *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984).

Given that the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result, the Supreme Court has established a two-part test for resolving a convicted defendant's claim that his counsel's performance was so defective as to require reversal of a conviction or death sentence. First, the defendant must show that counsel's performance was deficient, i.e., that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Williams v. Taylor*, 120 S.Ct. at 1511–1512 citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Second, the defendant must show that the deficient performance prejudiced the defense. *Id.* In other words,

the defendant must show that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's error, the result would have been different. *Darden v. Wainwright*, 477 U.S. at 184, 106 S.Ct. at 2473; *Christy v. Horn*, 28 F.Supp.2d at 322. A reasonable probability is one which is sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2052; *Christy*, at 322–323.

Furthermore, in evaluating counsel's performance, a reviewing habeas court is highly deferential and indulges a strong presumption that, under the circumstances, counsel's challenged actions might be considered sound strategy. *Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir.1999). However, when a petitioner shows that defense counsel "failed to exercise the customary skills and diligence that a reasonably competent attorney would exhibit under similar circumstances, the presumption must fail." *Christy*, at 323, citing *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir.1994).

Petitioner here raises numerous claims of ineffective assistance of counsel at the pre-trial, trial, sentencing and post-trial stages of his case. We now address these seriatim.[14]

(a) That Petitioner's rights were violated by ineffective assistance of trial counsel pre-trial and by appellate counsel's failure to raise these issues in his first petition under the Pennsylvania Post Conviction Relief Act.

Mr. Peterkin first argues that his trial counsel was ineffective at the pre-trial stage by (1) failing to investigate the case

---

**14.** We do find that, to the extent that trial counsel failed to object to those portions of the prosecutor's closing arguments which we have previously found improper and that appellate counsel failed to raise these issues

earlier, they were ineffective within the meaning of *Strickland* and its progeny. Given our grant of habeas relief on these grounds, we see no need to analyze these ineffectiveness claims further.

as to guilt; (2) failing to conduct proper discovery; (3) failing to investigate the crime scene; (4) failing to review fingerprint and ballistic evidence; (5) failing to consult and retain forensic experts; (6) failing to investigate the background and potential involvement of Stanley Trader; (7) failing to investigate the background and potential involvement of Leroy Little; (8) failing to investigate previous incidents at the Sunoco station; (9) failing to request a bill of particulars; (10) failing to request or move for disclosure from the prosecution; (11) failing to provide notice of an alibi defense; (12) failing to interview alibi and fact witnesses for the defense, including those witnesses identified in the G & P report; and (13) failing to challenge affidavits in support of warrants containing intentional misrepresentations or errors.

As per the Supreme Court, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066; *Alfano v. United States of America*, 1991 WL 167042 at *3 (D.N.J.1991). Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Lewis v. Mazurkiewicz*, 915 F.2d 106, 111 (3d Cir. 1990), citing *Strickland*, 466 U.S. at 690–691, 104 S.Ct. at 2065–66. *See Also: Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986). In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.*

Defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation as the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. *Lewis, supra.* Thus, while counsel's actions may be based on information supplied by the defendant, the Courts of Appeals are generally in agreement that the failure to conduct any pretrial investigation constitutes a clear instance of ineffectiveness. *U.S. v. Gray*, 878 F.2d 702, 711 (3d Cir.1989).

In application of the foregoing to the case at hand, the record reflects that the only investigation which Petitioner's trial counsel conducted consisted of reviewing the report of an investigator who interviewed Petitioner on one occasion and interviewed at least two of the witnesses whom Petitioner identified. Contrary to the representations made by defense counsel at the PCRA hearing on October 3, 1984 that there was "absolutely nothing fruitful that came from it in terms of any leads with which to prepare a defense," this report contained the names, addresses or telephone numbers of several potential alibi witnesses and the statements of one potential alibi witness and a potential character witness. (N.T. 10/3/84, 10; Exhibit "6" to Petition for Writ of Habeas Corpus). Specifically included in this report was the street and telephone number of the "Cynthia West" whom Petitioner indicated at trial he wished to call as an alibi witness. (N.T. 9/23/82, 102–103; 10/3/84, 20–21). Although the investigator's report does not specifically state that Cynthia was a proposed alibi witness, it does reflect that Mr. Peterkin contended that he was with one "Tow Jo" at the Red Top Garage on Sunday 11/29/81 watching the Pittsburgh game between 4 and 5 p.m. when he left to go

home for dinner and that Arlene Foster told the investigator that Petitioner returned home at 6 p.m. that night in time to watch the rest of the football game which ended at 7. Ms. Foster also told the investigator that Mr. Peterkin ate dinner and slept well that night, that he showed no indications that he had just murdered a good friend and that she had the receipts from her bank showing how much money she and her family took out of the bank to help Petitioner pay for his first attorney. If nothing else, these witnesses could have rebutted the testimony of Stanley Trader that when he returned to the Sunoco Station at around 4:15 p.m. that day he saw Petitioner alone in the attendant's booth and the testimony of Sherry Diggins that Mr. Peterkin was at her apartment on the evening of Sunday, November 29, 1981 at which time he gave her the murder weapon and asked that she dispose of the empty shells and the envelopes from which he had taken large amounts of cash. Ms. Foster's testimony could also have refuted the prosecution's contention that in the days immediately following the crimes, Petitioner had a large amount of cash.

What's more, the investigator's report, which defense counsel received in April, 1982, some six months before trial, further reflects that Ada Dennis, with whom Petitioner used to live, had reason to believe that Sherry Diggins was lying in the statements that she made to the police. Despite the statements given by Arlene Foster and Ada Dennis to his investigators and despite his acknowledgment that he "would be remiss" if he did not "follow through and obtain those statements referred to" in the investigator's report, Petitioner's trial counsel made no such efforts to do any "follow-up" investigation or to contact or interview any of the people identified by Petitioner as possibly having knowledge regarding his whereabouts and

activities on the day of the murders, his character or about the crimes themselves.

Finally, Mr. Peterkin reiterated in open court at the close of trial that he wished to call Cynthia to testify as an alibi witness although he thought that she lived on Lansdowne Street in Germantown and had recently gone to Texas. (N.T. 9/23/82, 102–104). Despite knowing of Mr. Peterkin's interest in calling Cynthia as an alibi witness and despite having had the investigator's report in his possession since April, 1982 with her street and phone number, defense counsel advised the Court that all he knew about Cynthia was that she was then in Texas. (N.T. 9/23/82, 101–104).

As the Pennsylvania Supreme Court recognized on direct appeal of Petitioner's conviction, "[f]ailure of trial counsel to conduct a more intensive investigation or to interview potential witnesses does not constitute ineffective assistance of counsel, unless there is some showing that such investigation or interview would have been helpful in establishing the asserted defense, or would have developed more than was already known by trial counsel." *See: Commonwealth v. Peterkin,* 511 Pa. at 317–318, 513 A.2d at 382. We draw the conclusion from this record that trial counsel's decision not to investigate was patently unreasonable and ineffective given that Mr. Peterkin's conviction rested in large measure upon the testimony of Stanley Trader and Sherry Diggins. Indeed, since Coy Gibson also testified that he saw and spoke with Ronald Presbery at the Sunoco station somewhere between 4:30 and 5 p.m. on 11/29/81 and the damning nature of Trader's and Diggins' testimony to Petitioner's defense, it is hard to imagine why defense counsel would not have at least followed up on the possibility of having Foster, "Tow Jo" and "Cynthia" testify on behalf of his client.

We therefore find that trial counsel's representation of the Petitioner was bla-

tantly deficient at least with respect to his failure to provide notice of an alibi defense and to interview alibi and fact witnesses for the defense, that appellate counsel was likewise ineffective in failing to raise these claims earlier and that these deficient performances prejudiced the defense to the extent that Petitioner was deprived of a fair, reliable trial. We further find that the decisions of both the Pennsylvania trial and Supreme Courts that Mr. Peterkin's attorneys were not ineffective by virtue of these failures are premised on unreasonable determinations of the facts and the evidence in this case and are contrary to the clearly established federal law established in *Strickland.*[15] For these reasons, we hold that the Petitioner is entitled to habeas relief for his attorney's failure to investigate his potential alibi and alibi witnesses.

As for the grounds which Petitioner advanced as Nos. (1) through (10) and (13)

above [16], we find that there is little record evidence on these points which may or may not require an evidentiary hearing. *See,* 28 U.S.C. § 2254(e)(2). However, in view of our grant of habeas relief with regard to defense counsel's failure to provide notice of an alibi defense and to investigate potential alibi and fact witnesses, we see no need to consider the necessity of an evidentiary hearing or to address these additional grounds at this point. Accordingly, we turn to the Petitioner's next assignments of error.

(b) That Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated as the result of the inadequacy of his counsel's trial performance.

Mr. Peterkin next argues that his trial counsel's performance was deficient in that he failed to: (1) adequately voir dire the jury; (2) make an effective opening statement; (3) humanize him; (4) suggest to

---

**15.** For instance, the Pennsylvania Supreme Court noted in its opinion on direct appeal that:

> "Appellant told counsel no more than that he had an alibi witness named "Cynthia" whose last name he could not remember; he did not remember her address in Philadelphia but knew that she had moved to somewhere in Texas. This information was clearly insufficient to conduct a meaningful search. At the evidentiary hearing, appellant had Cynthia's former landlady testify that if contacted she could have supplied information about her whereabouts. However, there was no indication that appellant told trial counsel about the landlady; and contrary to his assertion, the investigator's report does not contain her phone number. Therefore, trial counsel was not ineffective with regards to investigating this possible alibi witness."

Insofar as our review of the investigator's report reveals that it reads in relevant part on page 3, at No. 17: "Cynthia 843–9768 (lives on Rockland St). Age 22–5'5" Black Hair Brown Eyes ..." we find that the Supreme

Court's decision must have been based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**16.** (1) Failing to investigate the case as to guilt; (2) failing to conduct proper discovery; (3) failing to investigate the crime scene; (4) failing to review fingerprint and ballistic evidence; (5) failing to consult and retain forensic experts; (6) failing to investigate the background and potential involvement of Stanley Trader; (7) failing to investigate the background and potential involvement of Leroy Little; (8) failing to investigate previous incidents at the Sunoco station; (9) failing to request a bill of particulars; and (10) failing to request or move for disclosure from the prosecution. Also, Claim II, which contends that counsel was ineffective in failing to challenge the affidavits offered in support of the warrants issued for the Petitioner, thereby demonstrating a reckless disregard for the truth pursuant to *Franks v. Delaware.* (See Claim I, pp. 6–9, Claim II, pp. 9–10, Petitioner's Brief in Support of Petition for Habeas Corpus).

the jury the possibility that he was innocent (5) cross-examine prosecution witnesses; (6) effectively cross-examine the prosecution witnesses he did question; (7) present a single witness for the defense, including alibi witnesses; and (8) to present an effective closing argument.

In reviewing the record in this matter in light of the principles enunciated in *Strickland* and its progeny as discussed *supra*, we do not find that Mr. Peterkin's counsel was ineffective in any of the eight ways suggested here, save for his failure to explore the possibility of calling those alibi witnesses identified above. Again, counsel's trial performance need only be adequate—it is not required to be perfect. Thus, while there were certainly things which counsel could have done better with respect to his opening and closing arguments and in his trial strategy, his overall arguments, witness examinations and voir dire were far from ineffective. Petitioner's request for habeas relief on these grounds is denied.

(c) Petitioner's trial counsel was ineffective in failing to adequately prepare for sentencing and in failing to develop and present available and compelling mitigating evidence.

■■■ Mr. Peterkin next avers that his constitutional rights under the Sixth, Eighth and Fourteenth Amendments were violated by virtue of his trial counsel's failure to present available and mitigating evidence regarding his background and childhood to the jury during the sentencing phase of his trial.

The Supreme Court has long recognized the importance which mitigating evidence plays in ensuring that a capital trial is both humane and sensible to the uniqueness of the individual. *See, e.g., Eddings v. Oklahoma,* 455 U.S. 104, 110–111, 102 S.Ct. 869, 874–875, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 605, 98 S.Ct. 2954, 2964, 2965, 57 L.Ed.2d 973 (1978). Indeed, the Court has held that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Penry v. Lynaugh,* 492 U.S. 302, 317, 109 S.Ct. 2934, 2946, 106 L.Ed.2d 256 (1989), citing *Lockett v. Ohio,* 438 U.S. at 604, 98 S.Ct. at 2964. *See Also: Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); *Christy v. Horn,* 28 F.Supp.2d at 326.

In this case, both the trial court and the Pennsylvania Supreme Court previously rejected Petitioner's claims that his trial counsel was ineffective in failing to present evidence of his character and background at the sentencing phase of his trial. Specifically, the state courts found that trial counsel had a reasonable basis for his failure to present mitigating evidence of Petitioner's character and background given counsel's knowledge that the prosecution had damaging evidence that Petitioner had been under investigation for welfare fraud, had served in two different branches of the armed forces under different names and had had simultaneous amorous relationships with various women.[17]

Again, in reviewing the record of this matter under the *Strickland* standards, we find that the state courts' decisions that Mr. Peterkin's trial counsel was not ineffective are the result of both an unreasonable application of clearly established

---

**17.** *See: Commonwealth v. Peterkin,* 538 Pa. at 466–468, 649 A.2d at 126–127 and 511 Pa. at 318–319, 513 A.2d at 382–383, (1986).

Federal law and are based upon an unreasonable determination of the facts in light of the evidence presented. In so holding, we cannot accept as reasonable trial counsel's explanation that he presented no mitigating character evidence because he was concerned that whatever benefit character testimony could offer his client would be outweighed by the harm which would have resulted had the Commonwealth cross-examined those witnesses with evidence of Mr. Peterkin's two identities and the investigation for welfare fraud. To the contrary, we find that trial counsel's decision was objectively unreasonable in light of the fact that trial counsel himself had previously *stipulated* that Petitioner used two names and had received welfare benefits at a vacant lot and after the prosecutor argued in his closing to the jury without objection that the petitioner had committed welfare fraud. (N.T. 9/21/82, 158; 9/22/82, 18–19, 23, 36, 94–95; 9/24/82 41–42, 44). Hence, the damaging evidence which trial counsel feared had already been admitted. Petitioner therefore likely had absolutely nothing to lose and everything to gain by presenting some character evidence in his defense at sentencing and the failure of his attorney to do so under these circumstances rendered his assistance ineffective.

Moreover, it further appears that trial counsel did not explore Mr. Peterkin's background or family history, other than to discuss with Petitioner "the fact that he was also known as Otis Leach (sic), and he also had been discharged from the different branches of the Marines under that [name] and he was under welfare fraud investigation . . . and that he didn't have any other criminal history." (N.T. 10/3/84, 32–33). Mr. Lorusso did nothing to prepare for the sentencing portion of the trial, other than to make the decision that he "didn't want to get involved heavily in his character." (N.T. 10/3/84, 40–41).

Had trial counsel explored further, perhaps he would have learned that Petitioner's parents were alcoholics who neglected and abused him and his seven brothers and sisters, that his mother drank heavily while she was pregnant with him, that his father eventually placed him and his youngest sister in foster care only to have the foster care authorities eventually separate Petitioner from his sister and place him in the home of another abusive couple. Perhaps counsel would also have learned that Mr. Peterkin now exhibits some organic brain injury as a result of his mother's alcoholism during pregnancy and that he suffers from post traumatic stress disorder as the result of his troubled childhood. (Appendix to Petition for Writ of Habeas Corpus, Exhibits 20–24, 31–33). Accordingly, we also find Petitioner's trial counsel to have been ineffective for his failure to conduct any investigation into his character and background. *See: Williams v. Taylor, supra; Rompilla v. Horn,* 2000 WL 964750, 2000 U.S. Dist. LEXIS 9620 (E.D.Pa.2000).

5. *The trial court's instructions to the jury were defective at both the guilt/innocence and sentencing stages in violation of Petitioner's rights under the Fifth and Fourteenth Amendments.*

(a) The trial court's instruction on reasonable doubt violated Petitioner's constitutional rights to due process.

Mr. Peterkin first contends that the trial court defined "reasonable doubt" in such a manner as to improperly diminish the Commonwealth's burden of proof and to infringe upon the presumption of innocence to which he was entitled.

In state criminal trials, of course, the Due Process Clause of the Fourteenth Amendment protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 329, 112 L.Ed.2d 339 (1990), *rev'd in part on other grounds, Estelle v. McGuire,* 502 U.S. 62, 72, n. 4, 112 S.Ct. 475, 482, n. 4, 116 L.Ed.2d 385 (1991); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). An analysis of jury instructions claimed to impair a constitutional right must focus initially on the specific language challenged. *Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985); *Smith v. Horn,* 120 F.3d 400, 411 (3d Cir.1997). The allegedly constitutionally infirm language must be considered in its totality and no one particular sentence or paragraph should be considered in isolation. *U.S. v. Coyle,* 63 F.3d 1239, 1245 (3d Cir.1995). The proper inquiry is whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way that violates the Constitution. *Estelle v. McGuire,* 502 U.S. at 72, 112 S.Ct. at 482; *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); *Smith v. Horn,* 120 F.3d at 411. The fact that an instruction is allegedly incorrect under state law, however, is not necessarily a basis for habeas relief. *Estelle, supra.*

 Interestingly, although the beyond a reasonable doubt standard is a requirement of due process, the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). Moreover, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury

of the government's burden of proof. *Id.* For its part, the Pennsylvania Supreme Court has not prescribed a standard definition of reasonable doubt. *See, e.g., Pennsylvania Criminal Suggested Standard Jury Instructions,* Subcommittee Note to § 7.01, citing, *inter alia, Commonwealth v. Williams,* 432 Pa. 557, 248 A.2d 301 (1968).

 In this case, the trial court's reasonable doubt instruction read as follows: "A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to restrain before acting upon a matter of importance in his own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime. A reasonable doubt must be a real doubt. It may not be an imagined one or a speculative one nor may it be a doubt manufactured to avoid carrying out an unpleasant duty. So, to summarize, you may not find the Defendant guilty based on a mere suspicion of guilt. The Commonwealth has the burden of proving the Defendant guilty beyond a reasonable doubt, as I have defined that term for you. If it meets this burden then and only then must the Defendant be no longer presumed innocent and you must find him guilty. On the other hand if the Commonwealth does not meet its burden then you must find the Defendant not guilty." (N.T. 9/24/82, 61–62).

Petitioner here takes exception to the trial court's use of the word "restrain" rather than "hesitate" in describing how a reasonable doubt would affect the behavior of a reasonably careful and sensible person. "Hesitate" is defined in WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1994) as meaning "to be slow to speak, act or decide; to

pause in uncertainty or to be reluctant." "Restrain" is said to mean "to control, check; to take away the freedom or liberty of, or to restrict or limit." Although we would agree with Petitioner that the word "restrain" implies a slightly higher level of doubt than does the word "hesitate," we do not find that the trial court's use of the word "restrain" in its reasonable doubt instruction operated to raise the level of doubt so high as to constitute constitutional error. Rather, our review of the instruction as a whole reveals that the trial court adequately defined the meaning and outlined the proper implementation of the concept of reasonable doubt to the jury. *See, e.g., U.S. v. Jacobs,* 44 F.3d 1219, 1225–1226 (3d Cir.1995). Mr. Peterkin's request for habeas relief on the basis of the reasonable doubt instruction shall therefore be denied.

(b) The trial court violated Petitioner's constitutional rights under the Eighth and Fourteenth Amendments in allowing the jury to deliberate upon and issue a single death sentence for two capital murder convictions, and in failing to instruct the jury on the mitigating factors and the proper weighing of the aggravating and mitigating factors.

Mr. Peterkin next avers that because the jury was never instructed to consider each of his murder convictions and penalty separately and that since the trial court failed to instruct the jury on mitigating factors, there exists an unacceptable risk that the death penalty was arbitrarily imposed upon him in violation of the Eighth and Fourteenth Amendments.

■■■■ It has long been settled law that a general jury verdict is valid so long as it is legally supportable on one of the submitted grounds even though there are no assurances that a valid ground rather than an invalid one was actually the basis for the jury's action. *Griffin v. U.S.,* 502 U.S. 46, 49, 112 S.Ct. 466, 469, 116 L.Ed.2d 371 (1991). Thus, when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict stands if the evidence is sufficient with respect to any one of the acts charged. *U.S. v. Conley,* 92 F.3d 157, 163 (3d Cir. 1996). However, if any of the *legal* theories submitted to the jury was unconstitutional, a general verdict of guilty cannot stand. *Id.*

■■■■ Similarly, a jury's verdict must be set aside if it could be supported on one ground but not on another and the reviewing court is uncertain which of the two grounds the jury relied upon in reaching its verdict. *Mills v. Maryland,* 486 U.S. 367, 376, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988). Given that even greater certainty is demanded in reviewing death sentences, if there is a risk that a jury misunderstood that it was precluded from considering any mitigating evidence unless all twelve jurors agreed on the existence of a particular such circumstance, a death sentence is properly vacated. *Id.,* 486 U.S. at 383–384, 108 S.Ct. at 1869–1870.[18]

---

18. Inasmuch as Petitioner's conviction became final before *Mills* was decided, there is question as to whether *Mills* should be given retroactive application here. While we could locate no binding precedent on this issue, we agree with the rationale employed by the Middle District Court in *Jermyn v. Horn,* 1998 WL 754567 (M.D.Pa.1998), *aff'd,* 266 F.3d 257, 2001 WL 1110373 (3d Cir. Sept. 21, 2001)

that *Mills* represents a watershed rule of criminal procedure and thus falls within the second exception to the rule in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) barring retroactive application of new rules of criminal procedure on collateral review. What's more, the Pennsylvania Supreme Court applied *Mills* in issuing its decision on Petitioner's PCRA application.

■ Our review of the record here reflects that although the jury separately considered the murders of John Smith and Ronald Presbery in the guilt/innocence phase of the trial, at the sentencing phase it was asked only to consider whether the petitioner should be sentenced to life imprisonment or death for his having been previously found "guilty of murder of the first degree." The Pennsylvania Supreme Court, rejected Petitioner's contention that he was entitled to individual consideration and imposition of sentences for each separate offense, and held that Mr. Peterkin had failed to meet his burden of demonstrating that the jury or the trial court had acted improperly. In so holding, the Pennsylvania high court noted that a general verdict of guilty in a multi-count indictment serves as a verdict of guilty on all counts thereby enabling the court to impose sentence upon any count. For our part, we simply cannot find from the record now before us that the petitioner has met his burden of rebutting the presumption that the state court's decision on this point was correct. *See:* 28 U.S.C. § 2254(e)(1). Consequently, we must decline Petitioner's request for habeas corpus relief on this ground.

■ We reach the same conclusion with respect to Petitioner's argument that his constitutional rights were violated by the trial court's instructions concerning aggravating and mitigating circumstances.[19] Here, the trial court gave the following instructions regarding the finding and weighing of aggravating and mitigating circumstances:

"Members of the jury, you must now decide whether the Defendant is to be sentenced to death or life imprisonment.

The sentence will depend upon your findings concerning aggravating and mitigating circumstances. The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

The verdict must be a sentence of life imprisonment in all other cases. The Crimes Code defines aggravating and mitigating circumstances. The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. The Defendant has the burden of proving mitigating circumstances but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other side. All the evidence you heard earlier during the trial in chief as to aggravating or mitigating circumstances is important and proper for you to consider . . .

Now, the verdict is for you, members of the jury. Remember and consider all of the evidence giving it the weight to which it is entitled. Remember that you are not merely recommending a punishment. The verdict you return will actually fix the punishment at death or life imprisonment. Remember again that your verdict must be unanimous. It cannot be reached by a majority vote or by any percentage. It must be a verdict of each and every one of you. Remember that your verdict must be a sentence

For these reasons, we shall consider the *Mills* decision with respect to Petitioner's argument that the jury was not properly instructed as to mitigating circumstances in his case.

**19.** *See:* Claims XVI, XIX and XX of Petitioner's Brief and Supplement in Support of Petition for Writ of Habeas Corpus.

of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases your verdict must be a sentence of life imprisonment ..."

(N.T. 9/24/82, 160–163). Previously, the Pennsylvania Supreme Court considered the trial court's instructions to the jury during the sentencing portion of the trial under the PCRA. That Court found that, unlike the Maryland sentencing statute at issue in *Mills, supra,* the Pennsylvania sentencing statute [42 Pa.C.S. § 9711] upon which the trial judge here based his instructions did not bar consideration of mitigating evidence absent unanimous agreement as to each. *See: Commonwealth v. Peterkin,* 538 Pa. at 465, 649 A.2d at 126.

Our reading of the Pennsylvania statute and the trial court's instructions here is in accord with the Pennsylvania Supreme Court's findings. Furthermore, we find no evidence in this record to support Petitioner's assertions that the jury misinterpreted these instructions to mean that it was required to reach a unanimous agreement as to each mitigating circumstance before it could find its existence or that it did not understand how to weigh the aggravating and mitigating circumstances against one another. Indeed, the U.S. Supreme Court has never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required. *Franklin v. Lynaugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988). Accordingly, we cannot find that sufficient grounds exist to disturb the presumption of correctness to which the Supreme Court's decision on this issue is entitled.

(c) The trial court violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights by failing to accurately instruct the jury on parole.

Mr. Peterkin next argues that in failing to instruct the jury that he would not be eligible for parole if convicted of first degree homicide, the trial court violated his rights to due process of law.

In so arguing, Petitioner relies upon the decision of the United States Supreme Court in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). The Court held in that case that where a defendant's future dangerousness is at issue and state law would prohibit the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is not eligible for parole. Since the Commonwealth clearly placed his future dangerousness at issue through the prosecutor's closing argument, Petitioner argues, the trial court should have instructed the jury that he was not eligible for parole under Pennsylvania law for a first degree homicide conviction, his trial counsel was ineffective in failing to request such an instruction and his appellate counsel was ineffective for failing to raise this issue earlier.

Here, the Petitioner is correct that despite the fact that the prosecutor argued his potential future dangerousness to the jury, the trial court did not explain to the jury that if it found him guilty of the first degree murders of Messrs. Smith and Presbery and sentenced him to life imprisonment, he would not be eligible for parole. *Simmons,* however, was not decided until 1994, some seven years after Mr. Peterkin's sentence became final. More recently, the Supreme Court determined in *O'Dell v. Netherland,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) that the rule set out in *Simmons* requiring a capital defendant to be permitted to inform his

sentencing jury that he is parole ineligible if the prosecution argues that he presents a future danger, was new within the meaning of *Teague v. Lane, supra,* and thus not subject to retroactive application. It therefore appears that there was no such absolute requirement that the jury be instructed on parole at the time of Mr. Peterkin's trial. Accordingly, we find no error in the trial court's failure to instruct the jury on this point or in either trial or appellate counsel's performance on petitioner's behalf. The request for habeas relief on this basis is denied.

6. *Petitioner was denied his Fifth, Eighth and Fourteenth Amendment rights because there was insufficient evidence that Petitioner robbed John Smith, insufficient evidence that Petitioner committed murder in the course of robbing John Smith and insufficient evidence properly admitted at trial to convince a rational jury that Petitioner was guilty of first degree murder beyond a reasonable doubt.*

Petitioner next asserts that the evidence presented at trial was insufficient to support his convictions for robbery and murder nor was it sufficient to sustain the jury's finding of the sole aggravating circumstance (i.e. murder in the course of robbery) supporting the death penalty.

 A claim of insufficiency of the evidence places a very heavy burden on the party seeking to challenge a verdict. *United States v. Cooper,* 121 F.3d 130, 133 (3rd Cir.1997). In evaluating the sufficiency of the evidence to sustain a conviction, the evidence at trial is considered in the light most favorable to the government. *U.S. v. Veksler,* 62 F.3d 544, 551 (3rd Cir.1995). It is not for a reviewing court to weigh the evidence or to determine the credibility of witnesses; the verdict of a

jury must be sustained if there is substantial evidence to support it. *U.S. v. Schramm,* 75 F.3d 156, 159 (3rd Cir.1996), quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). A verdict will only be overturned if no reasonable juror could accept the conclusion of the defendant's guilt beyond a reasonable doubt. *Id.* In application of the foregoing to the case at hand, we find that, in light of the instances of prosecutorial misconduct, trial counsel ineffectiveness and trial error, we cannot now find from the evidence properly admitted of record that the jury's findings that Petitioner was guilty of the robbery of John Smith and of murdering him in the course of that robbery are supported by sufficient evidence. So saying, we would grant Petitioner habeas relief on this ground also.

7. *Petitioner is entitled to habeas relief because the Commonwealth failed to provide his counsel with exculpatory material under Brady v. Maryland, failed to give adequate notice of its intention to seek the death penalty and because the death penalty was not proportionate in this case.*

Petitioner finally argues that his constitutional rights were violated entitling him to the issuance of a writ of habeas corpus by virtue of the Commonwealth's failure to provide him with material and exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its failure to give notice that it intended to seek the death penalty in this case. Petitioner also contends that the sentence of death in his case was disproportionate to the verdicts rendered in similar cases.

In examining the record of this matter with an eye toward resolving these three arguments, we find that the petitioner has

not sufficiently developed the factual bases of these claims in the state courts to enable this court to conduct an adequate review for purposes of granting or denying habeas corpus relief. Moreover, the Supreme Court has held that there is no constitutional entitlement to a proportionality review of a state-imposed death sentence. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Rompilla v. Horn,* 2000 WL 964750, 2000 U.S. Dist. LEXIS 9620 (E.D.Pa.2000). Thus, in light of our findings and conclusions as discussed above, we see no need to conduct an analysis into the necessity of conducting an evidentiary hearing on or to otherwise address Petitioner's last three claims. *See:* 28 U.S.C. § 2254(e)(2).

### E. *Conclusion*

As discussed in detail above, we find that Petitioner is entitled to habeas relief on the following grounds:

(1) The improper admission of the hearsay testimony of Stanley Trader and Clarence Sears;

(2) prosecutorial misconduct in the introduction of evidence of uncharged crimes and in closing arguments at both the guilt/innocence and sentencing phases of the trial;

(3) ineffective assistance of trial and appellate counsel; and

(4) the insufficiency of the properly admitted evidence to support the jury's verdict.

In all other respects, Mr. Peterkin's habeas corpus petition is denied.

Inasmuch as it is unsettled whether the Third Circuit would follow the Courts of Appeals of the 5 th, 6 th and 10 th Circuits in holding that the relevant date for determining the applicability of the AEDPA to habeas corpus petitions is the date on which the actual petition itself was filed and not the date on which the motion for appointment of counsel was filed, we would issue a certificate of appealability with regard to that claim only. *See Generally:* 28 U.S.C. § 2253; Fed.R.App.P. 22(b).